No. 86,161

STATE OF KANSAS, *Appellant*, v. DEMETRIUS HARGROVE, *Appellee*.

(45 P.3d 376)

Opinion filed April 19, 2002.

*Michael A. Russell*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellant.

*Kirk C. Redmond*, of the Death Penalty Defense Unit, of Topeka, argued the cause, and *Ronald F. Evans*, of the same unit, was with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: The State of Kansas appeals from the trial court's dismissal of capital-murder charges against Demetrius Hargrove on the grounds that his speedy trial rights under the Agreement on Detainers Act (Agreement), K.S.A. 22-4401 *et seq.*, had been violated. The State's appeal contends the trial court erred: (1) when it applied the Agreement to the present case, and (2) by abusing its discretion in finding that more than 120 days were chargeable to the State, pursuant to the speedy trial provision in Article IV of the Agreement. We answer the first issue and do not reach the second.

## Factual background and proceedings

The ultimate questions in this appeal relate to the proceedings after charges were filed but, based on evidence presented at the preliminary hearing, we first set forth the facts which were developed to substantiate the charges in this case.

In early 1998, Hargrove and Christopher Trotter were selling drugs. One of their regular customers, who also sold drugs on their behalf, was Elmer Berg. Over time, Berg accumulated a debt to

Hargrove in the amount of $1,500. Hargrove told Trotter at one point that he would no longer sell cocaine to Berg.

On February 19, 1998, Hargrove advised Trotter he was coming over to get some cocaine to sell. Hargrove arrived at Trotter's residence, and Berg stopped behind him in a separate car. With Berg was his sister, Misty Castor. Because Trotter did not have scales at his house, Trotter and Hargrove went to go to Hargrove's house to divide and weigh the cocaine.

When Trotter entered Hargrove's car, he asked Hargrove why Berg was following them. Hargrove stated he was going to sell cocaine to Berg. Trotter reminded Hargrove of his prior statements that he was no longer going to sell cocaine to Berg due to Berg's failure to pay the owing drug debt. Hargrove looked at Trotter, then stated that he was going to "knock" Berg, which means to kill him.

Hargrove drove to Coronado Park and then stopped. Berg stopped behind him. Hargrove then reached under the seat of his car and pulled out a .38 caliber revolver. He walked to Berg's car. Trotter heard four gun shots and a female say, "No." Hargrove returned to his car. En route to Trotter's home, Hargrove threw the gun down a sewer drain.

The police later discovered the dead bodies of Berg and Castor in the vehicle, Berg having been shot twice in the chest and head, and Castor having been shot twice in the neck and back. The police investigation which ensued ultimately resulted in the filing of charges.

On February 11, 1999, Hargrove was charged with two counts of first-degree murder and one count of criminal possession of a firearm. On February 12, 1999, the Wyandotte County Sheriff's office sent a request for detainer to the Correction Corporation of America in Leavenworth, Kansas, a federal holding facility where Hargrove was awaiting trial on federal kidnapping charges. The document stated, in pertinent part:

"Enclosed is our warrant for [Demetrius Hargrove] who is presently in your custody. Please lodge a detainer on subject in our favor and notify this office when he is available for pick-up.

"We will extradite. Should subject refuse to waive extradition, contact this office by phone."

It is undisputed that the State's prosecutors did not know of the filing of this document. On August 17, 1999, Hargrove was sentenced on a federal kidnapping conviction to 35 years' imprisonment. Eight days later, the State petitioned the Wyandotte County District Court for a writ of habeas corpus *ad prosequendum*, and on the same day the writ was granted. In granting the writ, the court ordered:

"It is therefore considered and ordered that a Writ of Habeas Corpus *Ad Prosequendum* issue out of and under the Seal of [this court] . . . directed to said U.S. Marshall to release the body of said Demetrius Hargrove, to the Wyandotte County Sheriff's Department commanding him to produce the body of [Hargrove] . . . at the criminal docket . . . on the 14th day of September, 1999."

On September 10, 1999, Hargrove made his first appearance in Wyandotte County. On November 22, 1999, the State amended the charges, dropping the first-degree murder charges and adding one count of capital murder in violation of K.S.A. 21-3439. At this point, Hargrove's counsel was permitted to withdraw and the Kansas Death Penalty Defense Unit was appointed. Numerous motions usual in a death penalty cases were filed and continuances granted at the request of both parties. Hargrove was bound over following a preliminary hearing on March 20, 2000. On May 25, 2000, the trial court found the speedy trial provisions of K.S.A. 22-3402 did not apply in this case because Hargrove was not being held in custody "solely" on the charges herein as the result of his kidnapping sentence in the United States District Court, District of Kansas.

On October 13, 2000, a copy of the detainer was faxed from the United State Marshals Service to defense counsel. On October 18, 2000, Hargrove moved to dismiss the charges against him for the State's failure to comply with the Agreement, K.S.A. 22-4401. The motion was heard on October 24, 2000.

Hargrove argued that his right to a speedy trial under the Agreement was violated in that he had spent approximately 405 days in the custody of the State of Kansas, which was well beyond the 120-

day limit. The State responded that it was not its intent to use a detainer or the Agreement to gain custody of Hargrove, that K.S.A. 22-4401 did not apply because Hargrove was not serving a sentence at the time the detainer was lodged, and that even if the 120-day limit did apply major portions of the delay time was chargeable to Hargrove.

Hargrove contended that he should not be penalized for making motions, and that the court often left his motions pending for an excessive amount of time. He argued in the alternative that even if a certain amount of time was charged to him, the State had still exceeded its 120-time limit. He also contended that the statute does not require an individual to be serving a sentence at the time a detainer is lodged, but rather at the time the individual is transferred.

The trial court found in Hargrove's favor and dismissed the charges with prejudice. The court noted that up until its discovery, "everyone involved in the case . . . was under the assumption that there was no detainer filed." The court also noted that, although there was no bad faith involved, the defense counsel had been told at "every stage of the way . . . no detainer existed." The court found that Hargrove had consistently been concerned about his right to a speedy trial, and the court found "no fault with the efforts of the defendant in this case to protect his right to a speedy trial." In dismissing the charges, the court concluded:

"It gives me no pleasure or joy to reach the conclusions that I have and every tortured scenario that I have been able to—to predicate has fallen simply because there's no basis in law for it. . . . There's never been any juncture where the defendant has not been concerned about his right to a speedy trial too. He never waived or gave up those rights. You can't waive or give up a right that you didn't even know you had."

The State appeals the court's dismissal, raising the two issues previously set forth.

## Analysis

The State first argues that the trial court erred by applying the Agreement to the present case. The State contends the provisions of the Agreement do not and never were intended to apply to

persons being detained for trial who are not serving prison sentences. Whether the Agreement applies under these facts is a question of law subject to our unlimited review. *State v. Lewis*, 263 Kan. 843, 847, 953 P.2d 1016 (1998).

We have numerous discussions in Kansas cases relating to the Agreement, see, for example, *State v. Robbins*, 272 Kan. 158, 163-65, 32 P.3d 171 (2001); *State v. Rodriquez*, 254 Kan. 768, 771-75, 869 P.2d 631 (1994); *State v. White*, 234 Kan. 340, 343-44, 673 P.2d 1106 (1983); *State v. Clark*, 222 Kan. 65, Syl. ¶¶ 1, 2, 3, and 4, 563 P.2d 1028 (1977), but we have not previously considered whether the Agreement applies to an individual who is merely a pretrial detainee in another jurisdiction and has not been convicted of any crime nor serving a term of imprisonment.

Highly summarized, if the Agreement applies, Article III requires a prisoner to be brought to trial within 180 days where the prisoner has requested final disposition of a complaint, and Article IV requires a trial to be commenced within 120 days if the prisoner is returned pursuant to a request for temporary custody where the charges are pending. *Robbins*, 272 Kan. at 164.

The specific portion of the Agreement on which this case turns is K.S.A. 22-4401, Art. IV(a), which states:

"The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending *shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment* in any party state made available in accordance with article V(a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated: *Provided,* That the court having jurisdiction of such indictment, information or complaint shall have duly approved, recorded and transmitted the request." (Emphasis added.)

The legislative sanction for failure to comply with the 120-day time limit is dismissal of the charges with prejudice. Also, the detainer becomes without effect. K.S.A. 22-4401, Art. V(c).

In support of its assertion that a defendant must be serving a sentence at the time the detainer is lodged before the terms of the Agreement apply, the State cites *United States v. Mauro*, 436 U.S. 340, 56 L. Ed. 2d 329, 98 S. Ct. 1834 (1978); *United States v. Reed*, 620 F. 2d 709 (9th Cir. 1980); *State v. Reynolds*, 218 Neb. 753,

359 N.W.2d 93 (1984); *State v. Leisure*, 838 S.W.2d 49 (Mo. App. 1992); *People v. Carter*, 193 Ill. App. 3d 353, 549 N.E.2d 763 (1989); *Dorsey v. State*, 490 N.E.2d 260 (Ind. 1986).

In *Mauro*, the United States Supreme Court combined and considered two cases concerning the Agreement. Highly simplified, in both cases the defendants were transferred pursuant to writs of habeas corpus *ad prosequendum*. But, in one of the cases, the writ was preceded by a detainer delivered to the sending state. The Court held the situations in the two cases differed and ruled that a writ of habeas corpus *ad prosequendum* by itself does not invoke the requirements of the Agreement. 436 U.S. at 357-61.

The State asks us to look to the *Mauro* Court's definition of "detainer" and the adoption of that definition by several other courts. See *United State v. Hart*, 933 F.2d 80 (1st Cir. 1991); *United States v. Muhammad*, 948 F.2d 1449 (6th Cir. 1991), *cert. denied* 502 U.S. 1119 (1992); *United States v. Trammel*, 813 F.2d 946 (7th Cir. 1987); *United States v. Saffeels*, 982 F.2d 1199 (8th Cir.), *cert. granted, judgment vacated, and case remanded* 510 U.S. 801 (1993). In attempting to decide whether a writ of habeas corpus *ad prosequendum* was a detainer, the Court stated:

"The Agreement itself contains no definition of the word 'detainer.' The House and Senate Reports, however, explain that '[a] detainer is a *notification filed with the institution in which a prisoner is serving a sentence*, advising that he is wanted to face pending criminal charges in another jurisdiction.' H.R. Rep. No. 91-1018, p. 2 (1970); S. Rep. No. 91-1356, p. 2 (1970)." (Emphasis added.) 436 U.S. at 359.

The State relies on the "in which a prisoner is serving a sentence" wording to conclude that Hargrove was not serving a sentence when the initial "hold" was filed, which, therefore, does not institute the operation of the Agreement. And, because a writ of habeas corpus *ad prosequendum* is not a detainer unless a "written request for temporary custody" had been filed, that the Agreement has no effect in our case.

In *Reed*, a notation "Hold for U.S. Marshals" was not deemed a detainer because it was made by a State officer, but more applicable to the State's argument of not invoking the Agreement, the opinion states:

"Second, appellant was not serving a 'term of imprisonment' within the meaning of the statute. Appellant was in custody awaiting trial on state and federal charges and awaiting revocation of his parole arising out of an earlier state charge. The purpose of the Interstate Agreement on Detainers Act is 'to minimize the adverse impact of a foreign prosecution on rehabilitative programs of the confining jurisdiction.' *United States v. Milhollan*, 599 F.2d 518, 528 (3d Cir. 1979), *cert. denied,* 444 U.S. 909, 100 S. Ct. 221, 62 L. Ed. 2d 144 (1979), *quoting, U.S. ex rel. Esola v. Groomes,* 520 F.2d 830, 836-37 (3d Cir. 1975). We agree with the decisions of other circuits that neither a pretrial detainee nor a parole violator has a sufficient interest in the rehabilitation programs of his confining institution to justify invocation of the Act. *United States v. Milhollan, supra* (pretrial detainee); *United States v. Harris,* 566 F.2d 610 (8th Cir. 1977) (pretrial detainee); *United States v. Roberts,* 548 F.2d 665 (6th Cir. 1977), *cert. denied,* 431 U.S. 931, 97 S. Ct. 2636, 53 L. Ed. 2d 246 (1977) (pretrial detainee); *United States v. Dobson,* 585 F.2d 55 (3d Cir. 1978), *cert. denied,* 439 U.S. 899, 99 S. Ct. 264, 58 L. Ed. 2d 247 (1978) (parole violator)." 620 F.2d at 711-12.

*Reynolds'* holding relates to not placing on the receiving State the burden of requiring a sending State to promptly comply with the Agreement's provisions, see 218 Neb. at 761, and we do not deem it to be in any manner applicable to our case.

The issue and result in *Leisure* appears to be consistent with the State's arguments, as it states: "Agreement on Detainers did not apply to a pretrial detainee, nor when appearance in state court was obtained throughout writ of habeas corpus *ad prosequendum* rather than detainer." 838 S.W.2d 49, Syl. ¶ 3. In *Carter,* detention on a federal parole violation was not a "term of imprisonment" and therefore, the speedy trial term of Agreement on Detainers Act did not apply. See 193 Ill. App. 3d 353, 549 N.E.2d 763, Syl. ¶¶ 1-4. In *Dorsey,* it was held that a "[d]efendant who was being detained by Michigan authorities while awaiting trial and was also serving a sentence at the county jail was not qualified as an intended beneficiary of the Interstate Detainers Agreement, [citation omitted] which applies to persons already convicted and serving time in prison." 490 N.E.2d 260, Syl. ¶ 1.

Hargrove relies on our decision in *Clark,* 222 Kan. 65. There, we refused to narrowly define a detainer under the Agreement, stating: "A detainer is a hold order or informal demand by one exercising public authority for the possession of a person already in lawful custody." 222 Kan. at 67. Under this definition, a demand

need only be made on the public authority who has "lawful custody" of the prisoner. However, as in *Mauro*, the facts of *Clark* are distinguishable in that Clark was clearly incarcerated at the time the detainer was filed. Clark did not involve a pretrial detainee.

The authoritative value of *Clark* in regards to its finding that a temporary request for custody by itself invokes the Agreement is questionable in light of subsequent decisions of the United States Supreme Court, including *Mauro* and *Cuyler v. Adams*, 449 U.S. 433, 66 L. Ed. 2d 641, 101 S. Ct. 703 (1981). In *Cuyler*, the Agreement was found to be an interstate compact, "the interpretation of which presents a question of federal law." 449 U.S. at 442. We are bound by decisions of the United States Supreme Court concerning questions of federal law. *Lawrence Paper Co. v. Gomez*, 257 Kan. 932, 934, 897 P.2d 134, *cert. denied* 516 U.S. 869 (1995) (quoting *Ritchie v. Johnson*, 158 Kan. 103, 117, 144 P.2d 925 [1944]).

Hargrove's reliance on several decisions from other state courts, including *Felix v. United States*, 508 A.2d 101 (D.C. 1986), *People v. Zetsche*, 188 Cal. App. 3d 917, 233 Cal. Rptr. 720 (1987), and *State v. Helmstetter*, 914 P.2d 474 (Colo. App. 1995), are helpful to his arguments but different factually and in the arguments made.

In *Felix*, it was held that once a person has been convicted and has begun serving that sentence in the sending jurisdiction, such person's status is distinguishable from that of a pretrial detainee, and such person is entitled to the speedy trial protection of the Agreement. 508 A.2d at 105-08. The facts of *Felix* differ from ours because there a request was made by Felix for disposition of the charges against him while we have no such request by Hargrove.

The District of Columbia Court of Appeals in the *Felix* opinion recognized that it had in *Christian v. United States*, 394 A.2d 1 (D.C. 1978), *cert. denied* 442 U.S. 944 (1979), held that the Act does not protect pretrial detainees but reasoned that Felix's status changed once he was convicted and made the request. There is language in the *Christian* opinion, which *Felix* distinguishes, that is actually more helpful to the State's contentions here. *Christian* states:

"The Agreement was enacted to cure the disadvantages of the detainer system inuring to sentenced prisoners who had entered the life of the institution to which they had been committed. There is nothing in the legislative history or in the Agreement itself to indicate that its provisions were intended to apply to persons who were not involved in rehabilitative programs. Article IV(e) was designed to avoid the shuttling back and forth between jurisdictions and the resulting disruptive effect such transfers would have on a consistent treatment program and to promote the speedy disposition of outstanding charges upon which the detainers were based. For these reasons, courts which have addressed the issue have recognized that a prisoner who is being temporarily incarcerated pending disposition of charges is not entitled to invoke the protections of the Agreement. *United States v. Harris,* 566 F.2d 610 (8th Cir. 1977); *United States v. Roberts,* 548 F.2d 665 (6th Cir.), *cert. denied* 431 U.S. 920, 97 S. Ct. 2636, 53 L. Ed. 2d 246 (1977); *United States v. Evans,* 423 F. Supp. 528 (S.D.N.Y. 1976), *aff'd,* 556 F.2d 561 (2d Cir. 1977); *Cresong v. Nevil,* 51 A.D. 2d 1096, 381 N.Y.S. 2d 355 (1976); *Seymour v. State,* 21 Ariz. App. 12, 515 P.2d 39 (1973); *Davidson v. State,* 18 Md. App. 61, 305 A.2d 474 (1973). In *Roberts,* the court stated:
'We conclude that the Agreement is only concerned that a sentenced prisoner who has entered into the life of the institution to which he has been committed for a term of imprisonment not have programs of treatment and rehabilitation obstructed by numerous absences in connection with successive proceedings related to pending charges in another jurisdiction. There is no indication in the language of the Agreement or in the legislative history that its provisions were intended to apply to persons being detained for trial who are not serving prison sentences. [*United States v. Roberts, supra* at 670-71.]'
This reasoning is sound. If a prisoner is in custody to await trial, and is not involved in special institutional treatment or rehabilitative programs geared toward his eventual release into society, the potential for abuse of the detainer system is not present." 394 A.2d at 40.

It appears the cases which *Felix* brings before us, *Christian, Roberts, et al.,* provide much more support to the State's position than to Hargrove.

*Zetsche* does involve a prisoner who was first a pretrial detainee (not entitled to any protection under the Agreement) but was later granted protection under the Agreement but found to have entered a plea within the Article IV time period. See 188 Ca. App. 3d at 924-26.

*Helmstetter* is the strongest case cited by Hargrove. There, the Colorado Supreme Court upheld the trial court's dismissal of charges against the defendant based on a violation of the anti-shuttling provisions of Article IV(e). 914 P.2d at 477-78. However,

the State did not argue either at the trial level or on appeal that the detainer filed prior to pronouncement of sentence did not fall within the purview of the Agreement. The issue before us, as in *Felix*, was not considered by the court in finding the Agreement to be applicable and upholding the dismissal of charges.

Our research reveals one other federal circuit court and one additional state supreme court that have addressed the issue we face. In *United States v. Currier*, 836 F.2d 11 (1st Cir. 1987), the defendant was in state custody while awaiting sentencing when, on May 9, 1986, a document purporting to be a detainer was filed against him by federal authorities. On May 16, and July 11, 1986, the defendant appeared in federal court pursuant to writs of habeas corpus *ad prosequendum*. Defendant was sentenced and began serving his prison sentence for the state charges on June 18, 1986. He was subsequently convicted of the federal charges, and he appealed his convictions claiming that his rights under the Interstate Agreement on Detainers Act, Art. IV(e), 18 App. U.S.C. § 1 et seq. (1982) had been violated. The First Circuit Court of Appeals refused to find that defendant's failure to raise the issue until after he was convicted constituted a valid waiver, but the court found that because the detainer was filed prior to sentencing it did not invoke the provisions of the Agreement by stating: "We conclude, therefore, that the first 'detainer' [the May, 9, 1986 detainer] did not trigger the prohibition of Article IV(e) because when the document *issued* in May, appellant had not yet begun serving his state sentence." (Emphasis added.) 836 F.2d at 16. Application of this decision to our facts would require that we find the February 12, 1999, "detainer" did not trigger the protection of the Agreement.

In *State v. Herrick*, 686 A.2d 602 (Me. 1996), the Maine Supreme Court considered whether a detainer filed prior to sentencing triggered the protection of the Agreement after sentencing or whether a new detainer must be filed. A detainer was filed against Herrick in December 1994 by Maine, while he was being held on a bond violation in Wisconsin. Herrick was sentenced for the Wisconsin violation on February 8, 1995. On February 15, 1995, Herrick sent a letter to officials in Maine attempting to invoke the 180-day speedy trial provision under Article III of the Agreement. A

second detainer was filed by Maine on May 4, 1995, and on May 23, 1995, Maine authorities received his February 15th letter. Herrick appealed his conviction, arguing that the detainer filed in December became a detainer under the Agreement once he began serving his sentence. The Supreme Court rejected his argument and held as follows:

"The letter sent by [Maine authorities] in December 1994 was not a 'detainer' for the purposes of the [Agreement] because Herrick was not yet serving a prison sentence. Herrick's attempts to invoke his rights under the [Agreement] prior to May 1995 did not trigger the 180-day time limit contained in Article III because there was no *effective* detainer lodged against him at that time. Once an effective detainer was lodged against Herrick and he invoked his rights under the [Agreement], he was brought to trial within 180 days." (Emphasis added.) 686 A.2d at 604.

One of the purposes of the Agreement, stated in Article I, and discussed by this court in *State v. Rodriguez*, 254 Kan. 768, 771, 869 P.2d 631 (1994), is "to 'encourage the expeditious and orderly disposition of such charges' because outstanding detainers 'produce uncertainties which obstruct programs of prisoner treatment and rehabilitation.'" If an individual, such as Hargrove, is not serving a sentence at the time the detainer is filed, he has no vested interest in the programs of treatment and rehabilitation available to prisoners. If a detainer is filed at that time, no credible argument can be made that it comes within the ambit of the Agreement.

Application of all of the case law we have previously cited produces the following holdings in this case. Pretrial detainees are not under the protection of the Agreement. A detainer filed prior to sentencing is not one that effectively invokes the provisions of the Agreement. Once sentencing and service of that sentence occurs, then the provisions of the Agreement may become effective and can be invoked.

In our present case, the detainer filed against Hargrove was filed prior to sentencing. Therefore, it was ineffective under the Agreement and it did not invoke the protection of the Agreement. The writ of habeas corpus *ad prosequendum* subsequently used by the State, under the *Mauro* standard and the numerous other cases cited, was issued as one that was not preceded by a detainer under

the Agreement. The writ of habeas corpus *ad prosequendum*, therefore, did not trigger the provisions of the Agreement either. The Agreement was not invoked under the facts of our case.

Hargrove contends in the alternative that the initial filing should be immediately transformed into a detainer under the Agreement once sentencing occurs. Hargrove fails to recognize this would work an unnecessary hardship on a state which files detainers to have to constantly check on the status of all detained individuals. We reject this argument.

We also reject Hargrove's suggestion that adopting the State's arguments would prohibit law enforcement agencies from ever filing a detainer against individuals in custody who had not yet been sentenced. The hold or detainer requested against a pretrial detainee remains effective, it just does not trigger the Agreement at that time. Our decision will not limit or restrict law enforcement agencies from obtaining custody of individuals being held by other jurisdictions.

Hargrove also argues it is contrary to the purposes of the Agreement, and the requirement of Article IX that it be "liberally construed to effectuate its purposes," to have prisoners affected by outstanding detainers which were filed prior to sentencing that could be left on file unchecked by the time limits of the Agreement. Hargrove's argument fails to recognize that the Agreement never mentions pretrial detainees, and had the legislature intended for them to come with the scope of the statute, it could have easily done so. It appears the drafters of the Agreement wished it to cover sentenced prisoners involved in treatment and rehabilitation and not in situations such as Hargrove found himself in this case where his custody was obtained by Wyandotte County to face capital-murder charges 8 days after his federal sentencing.

As it is presently written, the Agreement applies to detainers filed against individuals presently serving sentences. To "liberally construe" the Agreement to protect individuals not within the express language of the statute would violate our duty of construction to follow the intent of the legislature as expressed: "[W]hen a statute is plain and unambiguous, the appellate court must give effect to the intent of the legislature as expressed instead of determining

what the law should or should not be." *State v. Hildebrandt,* 270 Kan. 1, 5, 12 P.3d 392 (2000). As the statute states: "The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have a *prisoner* against whom he has lodged a detainer and *who is serving a term of imprisonment.*" K.S.A. 22-4401, Article IV(a). From this language alone, there is an unambiguously expressed requirement that an individual be both a prisoner and serving a sentence of imprisonment at the time the detainer is lodged in order for the detainer to come within the scope of the Agreement.

The trial court erred in finding the provisions of the Agreement were invoked under the facts of this case.

Reversed and remanded for further proceedings.

DAVIS, J., not participating.

BRAZIL, S.J., assigned.